### MILLS et al. v. BRILL et al.

(Supreme Court, Appellate Division, First Department.  June 9, 1905.)

1. FRAUD—FALSE REPRESENTATIONS AS TO CREDIT—STATEMENTS TO COMMERCIAL AGENCIES—INTENT TO DEFRAUD.

A tradesman who knowingly makes false statements to a commercial agency to procure credit is liable to an action for rescission and for damages to one who extends credit on the faith of the statement given out by the commercial agency, and who suffers injury thereby, although the representations were not made to him personally, and although there was no specific intent on the tradesman's part to defraud his creditors by the statements made by him.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, § 96.]

2. SAME—ACTIONS FOR DECEIT—EVIDENCE.

In an action for deceit, consisting in the making of false representations to a commercial agency, and consequently misleading a creditor who relied thereon, testimony that at about the time of the transactions in question witnesses would have loaned defendant various sums of money had he requested them to do so was incompetent.

Appeal from Special Term, New York County.

Action by Philo L. Mills and others against Abraham Brill and another. From a judgment for defendants, and from an order denying a new trial, plaintiffs appeal. Reversed.

Argued before HATCH, O'BRIEN, McLAUGHLIN, and INGRAHAM, JJ.

Frank R. Lawrence, for appellants.
Samuel D. Levy, for respondents.

McLAUGHLIN, J.  This action was brought to recover possession of personal property, or, in lieu thereof, damages. The complaint alleged, in substance, that in March, 1898, the defendant Brill, by means of false and fraudulent representations to the effect that he was doing a good business, discounting his bills, and worth about $50,000 over and above his liabilities, induced the plaintiffs to sell and deliver to him 125 dozen pairs of kid gloves; that the representations were false, and known by Brill to be so; that the same were made for the purpose of obtaining credit; that the plaintiffs, believing the representations to be true, and relying upon them, parted with the possession of their property; that they elected to rescind the sale, and had demanded a return of the property, which had been refused. The action was originally commenced against Brill, who, immediately following, made a general assignment to the defendant Bronner for the benefit of creditors, and he was thereafter made a party defendant. Brill and the assignee each interposed an answer, in which the material allegations of the complaint, in so far as the right to rescind the sale and recover possession of the property was predicated, were denied, and the assignment to and possession of the property, or some part of it, by the assignee was pleaded as a separate defense. The defendants had a verdict, and from the judgment entered thereon plaintiffs have appealed.

At the conclusion of the trial there was substantially no dispute between the parties as to the material facts involved. In this connection it appeared that in March, 1898, the plaintiffs received, through a salesman, an order from Brill for the gloves in question, and, though they had been dealing with him for some time, this order was so much larger than any previous ones that before filling it they obtained from the commercial agencies of R. G. Dun & Co. and Bradstreet a statement as to his financial standing, and, relying upon which they, on the 26th of that month, delivered the gloves to him; that a few days later they elected to rescind the sale, and demanded a return of the gloves, upon the ground that the statements were false and untrue; that Brill refused to return them; that on the 4th of April, 1898, this action was commenced, and on the day following Brill made a general assignment to the defendant Bronner for the benefit of creditors; that the inventory filed by the assignee showed at the time the assignment was made that Brill was insolvent; that he had property of the actual value of only $36,757.88, while his liabilities amounted to $65,592.54, and included in the indebtedness was a claim for money alleged to have been loaned to him by his brother-in-law, the assignee, amounting to $19,635.76, and also a claim for money alleged to have been loaned by his mother-in-law for $3,000; that the financial rating of Brill given by the commercial agencies to the plaintiffs was due to statements which he had made to them extending over a period of about two years; that in March, 1896, he stated to one of them that his inventory on the 1st of February of that year showed a surplus of nearly $50,000 after paying his brother William $3,000 and investing about $4,000 in bonds; that on the 20th of May following he stated to the other that his last inventory of February, 1896, showed a surplus of $54,600; that he stated in March, 1898, to a representative of R. G. Dun & Co., in answer to an inquiry as to his financial standing, after being told that on the basis of his former statements he was being rated at from $35,000 to $50,000, "I am worth just as much as I ever was;" that similar statements to the effect that he was solvent and had a surplus were made to both agencies. That these statements were made was not denied by Brill, nor did he deny that the same were not true, or that they did not correctly set forth his financial condition at the time they were made. On the contrary, he testified that his financial condition at the time the general assignment was made was substantially correct as set forth in the inventory, except that by taking the stock at its nominal value—which was nearly $20,000 in excess of its actual value—he concluded that his total assets were $55,890.71 and his liabilities $65,592.54, which included an indebtedness for borrowed money as follows: To his brother-in-law for over $19,000, some of it as far back as 1892; to his mother-in-law in the amount set forth in the inventory, borrowed prior to 1896—the time when the first statement was made; to his brother upwards of $4,000; and to the New Amsterdam Bank for $4,500. He further testified that his financial condition on the day he made the assignment was substantially the same as it was at the time he obtained possession of the goods, and it was then about

the same as it had been since 1895, except that it has improved somewhat. The undisputed facts therefore established that Brill, at the time he made the statements to the commercial agencies, did not have a surplus of $50,000 over and above his liabilities, nor did he have any surplus; on the contrary, that he was then insolvent. The statements were false, and known by him to be so. They were made for the purpose of obtaining credit, and thereby inducing parties with whom he might deal to part with their property. Such statements were calculated and intended to influence the action of others in extending credit to him. They came to the knowledge of the plaintiffs, and in reliance upon them they parted with their goods. There was thus established all the material facts necessary to enable them to reclaim the goods and for damage, viz., "representation, falsity, scienter, deception, and injury." Brackett v. Griswold, 112 N. Y. 454, 20 N. E. 376; Ettlinger v. Weil, 94 App. Div. 291, 87 N. Y. Supp. 1049; Kingsland v. Haines, 62 App. Div. 146, 70 N. Y. Supp. 873. It is true the representations made by Brill were not made to the plaintiffs personally, but that is of no importance. They were made to the commercial agencies for the purpose of obtaining, through them, a credit, and were just as effective for that purpose, and, if false, subjected Brill to the same liability as though made to the plaintiffs personally. Tindle v. Birkett, 171 N. Y. 520, 64 N. E. 210, 89 Am. St. Rep. 822; Eaton, Cole & Burnham Co. v. Avery, 83 N. Y. 31, 38 Am. Rep. 389; Pier Bros. v. Doheny, 93 App. Div. 1, 86 N. Y. Supp. 971; Arnold v. Richardson, 74 App. Div. 581, 77 N. Y. Supp. 763.

It is also true that direct proof was not given of Brill's intent to defraud the plaintiffs by making the false statements which he did as to his financial condition; but this was not necessary. When the plaintiffs had proved that the statements were false; that Brill knew it, and made the same for the purpose of obtaining credit—then his intent to cheat and defraud followed as a necessary inference. He may have expected to pay, but the liability was incurred upon the basis of a false statement, and the necessary result of his act was to cheat and defraud the plaintiffs, and therefore in law he must be held to have so intended. In Anonymous, 67 N. Y. 598, the court, in holding that under such circumstances intent would be inferred, said:

"But it is believed that no case can be found in the books holding that a trader who was hopelessly insolvent knew that he could not pay his debts, and that he must fail in business, and thus disappoint his creditors, could honestly take advantage of a credit induced by his apparent prosperity, and thus obtain property which he had every reason to believe he could never pay for. In such a case he does an act the necessary result of which will be to cheat and defraud another, and the intention to cheat will be inferred."

In Pier Bros. v. Doheny, supra, which was an action quite similar to this one, the court reversed the judgment, even though there was a finding by the referee that the defendant, in making the statements to the commercial agencies, "did not intend to deceive, cheat, or defraud the plaintiff," and in doing so said:

"There can be no doubt but that he made the statements for the purpose of establishing a credit with those who might deal with the company, and

that the statements were communicated to the plaintiff, and it was thereby induced to give the ninety-days credit, relying on the truth of the statements. It follows, therefore, as a matter of course, that Greenway intended to deceive the plaintiff, and thereby secure its property on credit, and such deceit resulted in damage to the plaintiff to the extent of the value of its hops sold and delivered. That was a fraud upon the plaintiff whether Greenway believed the property could be paid for or not; whether he intended it should be paid for or not. It was not necessary to find that the purchase was made with a design not to pay for the property in order to render the company liable."

And in a recent case in this court (Nathan v. Uhlmann, 101 App. Div. 388, 92 N. Y. Supp. 13), where action was brought to recover certain deposits from officers and directors of an insolvent bank, it was held that:

"Irrespective, therefore, of any intentional wrong or bad faith, the defendant, if the jury found that he had knowledge that the bank was insolvent, and participated thereafter in the receipt of deposits, was, as matter of law, guilty of fraud, and liable for the loss sustained thereby."

This rule is tersely stated in Coleman v. Wolcott, 1 Conn. 285, as follows:

"When the effect of an act understandingly done is necessarily injurious to the rights of another, the quo animo is not a matter of fact; it is settled, and becomes an inference of law."

See, also, 14 Am. & Eng. Encl. of Law (2d Ed.) 104, and cases cited, where it is said that:

"To render a false representation fraudulent, and the person making the same liable, it is not at all necessary that there shall have been any actual dishonesty of motive or intention. As far as the mental attitude of the party is concerned, all that is necessary is to show that he knew the representation was false, or to show facts from which such knowledge may be implied, and that he intended that it should be acted upon by the person injured."

The rule thus alluded to as to intent was not called to the attention of the jury; on the contrary, they were told, in effect (to which an exception was taken), that, if Brill did not intend to cheat the plaintiffs, then they must find for the defendants. The exception was well taken, and the finding of the jury that Brill did not intend to cheat and defraud the plaintiffs was clearly against the weight of evidence. Under the authorities cited his intent necessarily had to be inferred from his false statements, and by means of which he obtained possession of the plaintiffs' property, and thereby caused them damage. The judgment therefore must be reversed.

In view of the fact that there must be a new trial, it may not be out of place to also call attention to another error, which was committed in the admission of testimony. Brill was permitted to prove by the testimony of several witnesses that at or about the time of the sale of the goods and the assignment by him such persons would have loaned him various sums of money had he requested them to do so. The witness Koenig was permitted to testify that he was worth $50,000, and would have indorsed Brill's paper for $9,000 or $10,000, or would have loaned him $5,000; Bronner, that he would have loaned him $5,000 had he requested it; Rosenthal that he had done $900,000 worth of business the previous year, and on the 4th

of April, 1898, or any time prior thereto, he would have loaned Brill $5,000, or indorsed his note for that amount; and Brill himself was then permitted to testify that there were other persons who would have advanced him money, including a brother-in-law, who he stated was worth in the neighborhood of $750,000. All of the testimony of this character was duly objected to by plaintiffs' counsel, and it seems hardly necessary to add that the objections should have been sustained. It had no bearing upon the real issue, and its only effect was to divert the minds of the jury, and thereby induce them to conclude that the defendant did not intend to accomplish the necessary result of his own act; that, even though he intentionally made a false statement for the purpose of deceiving the plaintiffs, upon which they relied, nevertheless, inasmuch as he might have borrowed money from some one, he could not have intended to deceive. He did not borrow the money. He did deceive the plaintiffs, and these results cannot be changed by a mere possibility of what he might have done.

The judgment and order appealed from therefore must be reversed, and a new trial ordered, with costs to the appellants to abide the event. All concur.